No. 25-3136

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

MICHAEL ERWINE,

*Plaintiff – Appellant*,

v.

ZACHARY WESTBROOK, *et al.*,

*Defendants – Appellees*.

On Appeal from the United States District Court
for the District of Nevada
Case No. 3:24-cv-00045-MMD-CSD
Hon. Miranda M. Du

---

### APPELLEES' SUPPLEMENTAL BRIEF

---

Sydney Tarzwell
NATIVE AMERICAN
RIGHTS FUND
745 W. 4th Avenue, Suite 502
Anchorage, AK 99501
(907) 276-0680

Leonard R. Powell
Morgan E. Saunders
NATIVE AMERICAN
RIGHTS FUND
950 F Street NW, Suite 1050
Washington, DC 20004
(202) 785-4166
powell@narf.org

*Counsel for Appellees*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................... ii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................4

   I.  *DAVIS* IS BINDING AND PERSUASIVE PRECEDENT ON THE KEY ISSUES IN THIS CASE. ...................................................4

     A.  *Davis* Held, As A Matter Of Federal Law, That Tribes May Confer Absolute Immunity On Their Officials In Areas Of Tribal Control. ........4

     B.  *Davis*'s Other Holdings Inform Resolution Of The Remaining Federal Law Issues Here. ......................................................6

   II.  *DAVIS* ABSOLUTE IMMUNITY BARS NEVADA AND FEDERAL CIVIL RIGHTS CLAIMS.............................................................8

     A.  Absolute Immunity Protects Tribal Personnel Management Functions From Nevada Claims...............................................................8

     B.  Absolute Immunity Protects Tribal Personnel Management Functions From Federal Civil Rights Claims. ......................................9

       1.  *Tribal Absolute Immunity From Federal Civil Rights Claims Is Not Determined Using The Federal And State Test.* ...........................9

       2.  *The Federal And State Test Would Reach The Same Result.*...............12

CONCLUSION ...................................................................................15

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Acres Bonusing, Inc. v. Marston,*
17 F.4th 901 (9th Cir. 2021) ....................................................5

*AGK Sierra De Montserrat, L.P. v. Comerica Bank,*
109 F.4th 1132 (9th Cir. 2024)...............................................5

*Barr v. Matteo,*
360 U.S. 564 (1959) ..........................................................7, 13

*Bodi v. Shingle Springs Band of Miwok Indians,*
832 F.3d 1011 (9th Cir. 2016)................................................10

*Boney v. Valline,*
597 F. Supp. 2d 1167 (D. Nev. 2009) ...................................15

*Borough of Duryea v. Guarnieri,*
564 U.S. 379 (2011)...............................................................14

*Boyd v. Puyallup Tribal Police,*
No. C09-5573BHS, 2010 WL 100942 (W.D. Wash. Jan. 8, 2010) ......................5

*Butz v. Economou,*
438 U.S. 478 (1978) ........................................9, 11, 12, 14

*Cohen v. ConAgra Brands, Inc.,*
16 F.4th 1283 (9th Cir. 2021) ................................................5

*Davis v. Littell,*
398 F.2d 83 (9th Cir. 1968)......................................... *passim*

*Davis v. Scherer,*
468 U.S. 183 (1984) ................................................................9

*Diver v. Peterson,*
524 N.W.2d 288 (Minn. Ct. App. 1994)................................5

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938) ...............................................................................8

*Ex parte Young*,
209 U.S. 123 (1908) ...........................................................................12

*Great W. Casinos, Inc. v. Morongo Band of Mission Indians*,
74 Cal. App. 4th 1407 (1999) ...............................................................5

*Gregoire v. Biddle*,
177 F.2d 579 (2d Cir. 1949)................................................................13

*Iron Crow v. Oglala Sioux Tribe of Pine Ridge Rsrv.*,
231 F.2d 89 (8th Cir. 1956)...................................................................6

*Kern v. Levolor Lorentzen, Inc.*,
899 F.2d 772 (9th Cir. 1990)..........................................................13-14

*Kiowa Tribe v. Mfg. Techs., Inc.*,
523 U.S. 751 (1998) ..............................................................................9

*Littell v. Nakai*,
344 F.2d 486 (9th Cir. 1965)..................................................................6

*Michigan v. Bay Mills Indian Cmty.*,
572 U.S. 782 (2014) ...................................................................... 10, 14

*Mitchell v. Forsyth*,
472 U.S. 511 (1985)..............................................................................14

*Montana v. United States*,
450 U.S. 544 (1981) .............................................................................11

*Okla. Tax Comm'n v. Graham*,
489 U.S. 838 (1989) ...............................................................................4

*Rehberg v. Paulk*,
566 U.S. 356 (2012) .............................................................................13

*Santa Clara Pueblo v. Martinez*,
  436 U.S. 49 (1978) ........................................................11, 12

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) .........................................................9, 11

*Stock W. Corp. v. Taylor*,
  942 F.2d 655 (9th Cir. 1991).....................................................5

*Stock W. Corp. v. Taylor*,
  964 F.2d 912 (9th Cir. 1992) (en banc) ............................................5

*Tax Comm'n v. Graham*,
  489 U.S. 838 (1989) ............................................................4

*Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng'g*,
  476 U.S. 877 (1986) ..........................................................4, 9

*United States v. Oregon*,
  657 F.2d 1009 (9th Cir. 1981).....................................................5

*United States v. U.S. Fid. & Guar. Co.*,
  309 U.S. 506 (1940) ............................................................6

*Upper Skagit Indian Tribe v. Lundgren*,
  584 U.S. 554 (2018) ...........................................................10

*Williams v. Lee*,
  358 U.S. 217 (1959) ...........................................................11

## INTRODUCTION

*Davis v. Littell*, 398 F.2d 83 (9th Cir. 1968), carries both precedential and persuasive force on the application of absolute immunity in this suit. Although *Davis* was a diversity case, it was largely not a state law decision. Rather, a close parsing of the opinion reveals that *Davis* answered four distinct questions, which it decided under three sets of laws.

*Davis* first determined whether tribes are sovereigns who can bestow absolute immunity on their officials. This was a federal question, as the status of Indian tribes, the scope of their sovereignty, and the immunities that flow from that sovereignty are determined by federal law. And *Davis* held that the answer is yes: tribes enjoy sufficient independent status and control over their own laws and internal relationships that they may accord absolute privilege to their officers within areas of tribal control.

*Davis* next addressed two interrelated questions: whether the Navajo Nation had bestowed absolute immunity on its officials, and whether the Nation's former general counsel could claim that absolute immunity. These were questions of tribal law. Navajo law, however, directed the Court to look to federal law and appropriate state law to answer these questions, and appropriate state law (in that instance, Arizona law) followed federal law. *Davis* thus answered these questions based on federal official immunity principles. And it concluded that, under those federal

1

principles, the Nation's former general counsel possessed absolute immunity when he reported his views on the competence and integrity of a subordinate employee.

*Davis* finished by addressing whether tribal absolute immunity would apply in Arizona state court in a suit brought by an Arizona citizen. *Davis* opted to answer this question on state law grounds. It made an *Erie* prediction and concluded that an Arizona court, as a matter of comity, would likely choose to honor the immunity the Navajo Nation had bestowed.

The most critical holding for this case is *Davis*'s first one: tribes may bestow absolute immunity on their officials within areas of tribal control. As the answer to a federal law question, this holding is binding in this Circuit. It therefore does not matter, for this first question, that the claims in *Davis* and the claims here arise under different laws.[1]

*Davis*'s second and third holdings, as applications of Navajo law, do not determine whether Washoe law has bestowed absolute immunity on Tribal Appellees here. But *Davis*'s second and third holdings are still relevant to this case. They confirm that tribal personnel management functions are areas of tribal control within which tribes may bestow absolute immunity. This case's tribal law question, meanwhile, is easier than the tribal law questions were in *Davis*, as the Washoe Tribe

---

[1] *Davis* does not identify the laws under which Mr. Davis's claims arose. *See* 398 F.2d at 83. The *Davis* opening brief—attached to this supplemental brief—establishes that they arose under Arizona and DC law. *See Davis* Opening Br. at 5.

has expressly conferred absolute immunity on Tribal Appellees from claims arising out of their official duties.

*Davis*'s fourth holding matters here for what it did *not* decide. Given *Davis*'s prediction about Arizona law, *Davis* did not need to determine whether a state may allow a suit against an immune tribal official to proceed. The Supreme Court, however, has since answered that question: states cannot diminish tribal immunity.

Together, these principles are dispositive. Under *Davis*, the Washoe Tribe may confer absolute immunity on its officials for personnel management functions. It has expressly done so here. Nevada cannot diminish that immunity. Accordingly, absolute immunity bars Appellant's Nevada law claim.

Absolute immunity also bars Appellant's federal civil rights claims (statutory and constitutional). To be sure, *federal and state* officials normally enjoy only qualified immunity in federal civil rights suits. But tribal immunity is not congruent with federal and state immunity, and it can only be abrogated by Congress. In any event, the test that determines when federal and state officials may claim absolute immunity from federal civil rights claims would reach the same outcome. Recall that Navajo law directed the *Davis* Court to use federal immunity principles to determine whether personnel management functions were protected by absolute immunity. Because of that direction, *Davis* already conducted the analysis that would pertain to Appellant's federal civil rights claims under the federal/state framework, and it

3

concluded that absolute immunity applies. The Court should affirm.

## ARGUMENT

### I. *DAVIS* IS BINDING AND PERSUASIVE PRECEDENT ON THE KEY ISSUES IN THIS CASE.

#### A. *Davis* Held, As A Matter Of Federal Law, That Tribes May Confer Absolute Immunity On Their Officials In Areas Of Tribal Control.

The most important question that *Davis* addressed was its first one: whether tribes are "such … sovereign[s] as can bestow absolute privilege upon [their] officers." 398 F.2d at 84. As *Davis* held, the answer is yes. Indian tribes "enjoy[] sufficient independent status and control over [their] own laws and internal relationships." *Id.* They therefore can "accord absolute privilege to [their] officers within the areas of tribal control." *Id.*

That holding is binding within this Circuit. The nature and bounds of tribal sovereignty—including tribal immunities from suit—are "governed by federal law." *Okla. Tax Comm'n v. Graham*, 489 U.S. 838, 841 (1989) (per curiam); *see also, e.g.*, *Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng'g*, 476 U.S. 877, 891 (1986) (explaining that the tribal immunity "aspect of tribal sovereignty, like all others, is subject to plenary federal control and definition"). *Davis* itself made clear that its answer to this first question resolved a federal issue, as *Davis* grounded its decision in federal law principles. *See* 398 F.2d at 84 (noting the "federal domination of Indian affairs"). And because the answer to this first question was a federal law

4

holding, it constitutes controlling authority. *See, e.g.*, *AGK Sierra De Montserrat, L.P. v. Comerica Bank*, 109 F.4th 1132, 1136 (9th Cir. 2024) ("Precedent interpreting federal law is binding…."); *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1287-88 & n.5 (9th Cir. 2021) (applying federal preemption ruling from diversity-jurisdiction case).

Subsequent cases confirm that *Davis*'s first holding is a federal law decision and therefore binding in this Circuit. This Court's own decisions have followed it.[2] So have decisions from other jurisdictions and from district courts in this Circuit— including the district court decision here.[3] Indeed, Appellees have found no case in the nearly 60 years since *Davis* was decided that has suggested *Davis* lacks force

---

[2] *See Acres Bonusing, Inc. v. Marston*, 17 F.4th 901, 913 n.4 (9th Cir. 2021) ("*Davis* involved the issue of whether the tribe had 'bestowed' on its officers the personal defense of absolute immunity."); *Stock W. Corp. v. Taylor*, 942 F.2d 655, 664 (9th Cir. 1991) (looking to *Davis* to answer tribal official immunity question), *rev'd on reh'g on other grounds*, 964 F.2d 912 (9th Cir. 1992) (en banc); *United States v. Oregon*, 657 F.2d 1009, 1012 n.8 (9th Cir. 1981) (citing *Davis* for the proposition that tribal officials can possess immunity); *see also Stock W. Corp.*, 964 F.2d at 924 (O'Scannlain, J., dissenting) (noting that the outer boundaries of tribal official immunity are "governed by federal law" and citing *Davis* as a case that "consider[ed] whether tribal immunity extends to individual tribal officials").

[3] *See, e.g.*, *Great W. Casinos, Inc. v. Morongo Band of Mission Indians*, 74 Cal. App. 4th 1407, 1424 (1999) (invoking *Davis* for the point that tribes may accord absolute immunity to tribal officials within areas of tribal control); *Diver v. Peterson*, 524 N.W.2d 288, 291-92 (Minn. Ct. App. 1994) (dismissing Minnesota claims against tribal attorney based on *Davis*); *Boyd v. Puyallup Tribal Police*, No. C09-5573BHS, 2010 WL 100942, at *4 (W.D. Wash. Jan. 8, 2010) (relying on *Davis* and subsequent cases to dismiss Section 1983 claim against tribal police officers); *see also* 1-ER-10 (collecting cases where courts have "rel[ied] on *Davis* and treat[ed] it as good law").

because Mr. Davis asserted Arizona and DC claims.

*Davis* was also correct that tribes may confer absolute immunity on their officials within areas of tribal control. As mentioned above, *Davis* answered this question based on federal principles—three in particular. First, "the concept of tribal sovereignty has been found a sufficient basis for extending to Indian tribes sovereign immunity from suit." 398 F.2d at 84 (citing *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506 (1940)). Second, tribes are "distinct political communities." *Id.* (quoting *Littell v. Nakai*, 344 F.2d 486, 488 (9th Cir. 1965)). And third, "Indian tribes still possess their inherent sovereignty excepting only where it has been specifically taken from them, either by treaty or by Congressional Act." *Id.* (cleaned up) (quoting *Iron Crow v. Oglala Sioux Tribe of Pine Ridge Rsrv.*, 231 F.2d 89, 94 (8th Cir. 1956)). These federal principles remain as true today as they were at the time of *Davis*. And given these tenets, *Davis*'s conclusion that tribes may grant their officers and employees absolute immunity within areas of tribal control "can hardly be disputed." *Id.*

**B.    *Davis*'s Other Holdings Inform Resolution Of The Remaining Federal Law Issues Here.**

In addition to holding that tribes can confer absolute immunity on their officials in areas of tribal control, *Davis* answered three other questions. These other questions did not arise under federal law, but they also bear on the current dispute.

*Davis*'s second and third questions asked whether the Navajo Nation "c[ould]

6

be said to have bestowed absolute privilege on its executive officers" and whether the Nation's former general counsel was "such an officer of the Navajo Tribe as [could] claim absolute executive privilege." 398 F.2d at 84-85. These were tribal law questions. Navajo law, however, directed that their answers should "be guided by federal or appropriate state law." *Id.* at 84. Arizona law, likewise, followed federal immunity law. *See id.* at 85 (noting that Arizona "adopted the rule of *Barr v. Matteo*[, 360 U.S. 564 (1959)]"). *Davis* thus decided these questions using federal immunity principles. And *Davis* concluded that, under those principles, absolute immunity protected the Nation's former general counsel when he "reported … his views as to the competence and integrity of … a subordinate employee." *Id.*[4]

These second and third holdings, as applications of Navajo law, do not answer whether Washoe tribal law has bestowed absolute immunity on Tribal Appellees. They confirm, however, that tribal personnel management functions are areas of tribal control within which tribes may bestow absolute immunity. Otherwise, it would have been irrelevant that Navajo law extended absolute immunity to such functions—federal law would have rendered the immunity ineffective.

*Davis*'s fourth and final question concerned whether tribal absolute immunity

---

[4] In his supplemental brief, Appellant misquotes *Davis*. He says *Davis* "concluded [that the general counsel's statements] were 'directly tied to quasi-judicial functions.'" Aplt. Suppl. Br. at 2. He makes similar assertions about *Davis* elsewhere. *See id.* at 9-10. *Davis* contains no such quote, nor any line suggesting that the Court viewed the former general counsel's actions as quasi-judicial.

7

would, in "Arizona state court," bar "a suit brought by an Arizona citizen." *Id. Davis* opted to resolve that question on state law grounds. Making a "prediction" about how Arizona courts would rule, *Davis* opined that the answer was likely yes. *Id.* at 86. *See generally Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

For this case, the key feature of *Davis*'s fourth holding is what it did *not* decide. Given *Davis*'s prediction, *Davis* had no need to determine whether tribal immunity would bar a state claim when state law refused to recognize the immunity. That one question, however, has long since been resolved, as addressed next.

## II.   *DAVIS* ABSOLUTE IMMUNITY BARS NEVADA AND FEDERAL CIVIL RIGHTS CLAIMS.

### A.   Absolute Immunity Protects Tribal Personnel Management Functions From Nevada Claims.

Under *Davis*, absolute immunity applies to Appellant's Nevada law claim. The Washoe Tribe can confer immunity on its officials for personnel management functions. It has done so here. Indeed, this case's tribal law question is easier than the tribal law questions in *Davis*, as the Washoe Tribe has expressly conferred absolute immunity on Tribal Appellees from claims arising out of their official duties. Answering Br. at 31-34.[5] The only remaining question, left open by *Davis*, is whether Nevada *must* honor that immunity.

---

[5] Appellant waived his supplemental-brief argument about the meaning of tribal law (*see* Aplt. Suppl. Br. at 4) by failing to raise it in his opening brief. *See* Answering Br. at 34.

The answer is yes. In the decades since *Davis*, the Supreme Court has repeatedly held that tribal immunity, as "a matter of federal law," "is not subject to diminution by the States." *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 756 (1998). Tribal absolute immunity accordingly bars Appellant's Nevada law claim.

**B.     Absolute Immunity Protects Tribal Personnel Management Functions From Federal Civil Rights Claims.**

    ***1.     Tribal Absolute Immunity From Federal Civil Rights Claims Is Not Determined Using The Federal And State Test.***

Tribal absolute immunity also bars Appellant's statutory and constitutional federal civil rights claims. Absolute immunity is, of course, generally not the rule when federal civil rights claims are asserted against federal and state officials. Such officials enjoy only qualified immunity in federal civil rights suits, unless their "special functions require a full exemption from liability." *Butz v. Economou*, 438 U.S. 478, 508 (1978) (federal immunity); *see Scheuer v. Rhodes*, 416 U.S. 232, 246-48 (1974) (state immunity), *overruled on other grounds as recognized in Davis v. Scherer*, 468 U.S. 183, 191 (1984). But tribal immunities are "not congruent with that which the Federal Government, or the States, enjoy." *Three Affiliated Tribes*, 476 U.S. at 890. Instead, tribal immunities are broader than federal and state immunities in many areas.[6]

---

[6] *See Kiowa Tribe*, 523 U.S. at 760 (holding that tribal commercial activities are protected by tribal immunity); *id.* at 765 (Stevens, J., dissenting) (noting that this commercial-activity immunity is "broader" than that enjoyed by other sovereigns);

The different standards in this instance reflect the judiciary's "respect for Congress's primary role in defining the contours of tribal sovereignty." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 803 (2014). "[I]t is fundamentally Congress's job, not [the courts'], to determine whether or how to limit tribal immunity." *Id.* at 800. Accordingly, tribes' ability to confer absolute immunity on their officials in areas of tribal control can only be diminished by Congress.

No such congressional diminishment has occurred. Even as the Supreme Court has determined the contours of federal and state official immunity, "Congress has continued to exercise its plenary authority over tribal immunity, specifically preserving immunity in some contexts and abrogating it in others." *Id.* at 802. In that time, it has not acted to restrict tribal official immunity. Hence, tribes retain authority to bestow absolute immunity on their officials.

Congress has left tribal absolute immunity untouched for good reason. The constitutional, statutory, and policy considerations that justify rejection of the absolute immunity standard in the federal and state context do not apply in the tribal context. Federal and state officials, for instance, "are subject to the restraints

---

*Bodi v. Shingle Springs Band of Miwok Indians*, 832 F.3d 1011, 1020 (9th Cir. 2016) (identifying instances where tribal immunity is more robust than state immunity); *cf. also Upper Skagit Indian Tribe v. Lundgren*, 584 U.S. 554, 560 (2018) (deferring decision on whether immovable-property exception extends to tribal sovereign immunity because "immunity doctrines lifted from other contexts do not always neatly apply to Indian tribes").

imposed by the Federal Constitution." *Butz*, 438 U.S. at 495. If they were absolutely immune from federal civil rights claims, "the restrictions of the Federal Constitution … would be but impotent phrases." *Scheuer*, 416 U.S. at 248. That consideration, however, does not apply to tribal officials. They are "unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978).

Likewise, tribal officials lack the "broad authority" that necessitates a federal judicial check on federal and state officials. *Butz*, 438 U.S. at 505. Because they have expansive powers, federal and state officials clothed in absolute immunity could engage in "unconstitutional action on a massive scale." *Id.* at 506. But tribal officials' authority is far more circumscribed. Tribal officials presumptively lack power over nonmembers, and what power they do possess over nonmembers is highly constrained. *See Montana v. United States*, 450 U.S. 544, 565-66 (1981). Granted, tribal officials do have significant authority over tribal members. But that class of persons is typically small in number, and the place to resolve their tribal disputes is tribal court. *See Santa Clara Pueblo*, 436 U.S. at 59 (explaining that resolution of tribal matters in non-tribal fora "infringe[s] on the right of the Indians to govern themselves" (cleaned up) (quoting *Williams v. Lee*, 358 U.S. 217, 223 (1959))).

Congress's decision to leave tribal absolute immunity intact in federal civil rights suits also accords with its choice to create a separate and limited civil rights

11

regime for tribes. In the Indian Civil Rights Act ("ICRA"), Congress "impos[ed] certain [civil rights] restrictions upon tribal governments." *Id.* at 57. In doing so, Congress sought to "prevent[] injustices perpetrated by tribal governments," but it also "balance[d]" that objective against the "competing goal[] of …['']avoiding undue or precipitous interference in the affairs of the Indian people.'" *Id.* at 66-67 (quoting legislative history). Mindful of the "intrusive effect of federal judicial review upon tribal self-government," it opted not to "expos[e] tribal officials to the full array of federal remedies available to redress actions of federal and state officials." *Id.* at 70-71. Rather, it made habeas the only federal relief for ICRA violations. *See id.* And it allowed the continued assertion of tribal immunity against civil rights claims. *See id.* at 58-59.[7]

### 2. The Federal And State Test Would Reach The Same Result.

Absolute immunity would also apply here if, counterfactually, tribal immunity were subject to the test used to determine federal and state immunity. Federal and state officials possess absolute immunity from federal civil rights claims when "public policy requires" an "absolute exemption from personal liability." *Butz*, 438 U.S. at 506. By happenstance, *Davis* already applied this test to the tribal personnel

---

[7] The Supreme Court has noted that tribal officials in ICRA actions are "not protected by [a] tribe's immunity from suit." *Santa Clara Pueblo*, 436 U.S. at 59. But that does not suggest a limitation on tribal official immunity that could apply here. The Court was referring to claims against tribal officials for declaratory and injunctive relief, not claims for damages. *See id.* (citing *Ex parte Young*, 209 U.S. 123 (1908)).

management context when it answered its second and third questions. *See* Answering Br. at 22-24, 31-32. Recall that, although those were tribal law questions, Navajo law directed the *Davis* Court to decide them using federal immunity principles. *Supra* at 6-7; *see* 398 F.2d at 84-85 (citing *Barr v. Mateo*, 360 U.S. 564 (1959); *Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949)). And *Davis* concluded that, under those principles, tribal personnel management functions are "precisely the duties which [are] regarded as requiring the protection of [absolute] privilege." 398 F.2d at 85.

*First*, tribal personnel management functions are "so important," *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012), that they necessitate the "'unflinching discharge of official duties' free from the threat of suit and charge of malice," *Davis*, 398 F.2d at 85 (cleaned up) (quoting *Gregoire*, 177 F.2d at 581). Few matters are as critical to tribal self-determination as a tribe's control over the staffing and operations of its government and its receipt of uninhibited legal advice from its in-house general counsel. *See* Answering Br. at 24-25, 27, 59-60, 69-72.

*Second*, tribal personnel functions are "vulnerable to interference by means of litigation," *Rehberg*, 566 U.S. at 363, and therefore require "the elimination of the 'constant dread of retaliation' for injury committed in the course of duty," *Davis*, 398 F.2d at 85 (quoting *Gregoire*, 177 F.2d at 581). Employment is an area that is especially prone to litigation. *See* Answering Br. at 27; *Kern v. Levolor Lorentzen,*

13

*Inc.*, 899 F.2d 772 (9th Cir. 1990) (Kozinski, J., dissenting) (noting that "thousands" of employment suits are filed each year). Yet many tribes lack the resources to indemnify supervisors from lawsuits filed by aggrieved subordinates. *See Bay Mills*, 572 U.S. at 813 (Sotomayor, J., concurring) (explaining that "Indian reservations" "continue to experience significant poverty"). Thus, absent absolute immunity, tribal supervisors would be "at the mercy of litigants with frivolous and vexatious complaints." *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985). In turn, "[t]he discretion which [tribal supervisors] exercise … might be distorted if their immunity from damages arising from [personnel management actions] was less than complete." *Butz*, 438 U.S. at 515; *cf. Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390-91 (2011) (explaining that allowing government employees to "file [judicial] grievances on a variety of employment matters" would "subject a wide range of government operations to invasive judicial superintendence," "consume the time and attention of public officials, [and] burden the exercise of legitimate authority").

*Third*, and finally, the "safeguards built into" tribal personnel systems and the "remedies already available" to aggrieved tribal employees "provide sufficient checks" on tribal supervisors so as to eliminate the need for federal judicial review. *Butz*, 438 U.S. at 512, 516. This case is illustrative. The Tribe has a grievance process. 3-ER-429-431. And while Appellant alleges he was initially prevented from using that process, 3-ER-466-67, the Tribe knows about Appellant's allegations *now*.

14

*See generally* Washoe Amicus Br. Moreover, the alleged obstacles to Appellant's use of the grievance process—Tribal Appellees—are gone, as Tribal Appellees no longer work for the Tribe. *See* 3-ER-446. If Appellant's allegations had any merit, the Tribe would have every reason to rehire Appellant tomorrow and remove the allegedly libelous memo from his employee file.

To be sure, tribal personnel systems will sometimes fail. But there is also "the possibility of an alternate remedial system in the tribal courts" via ICRA. *Boney v. Valline*, 597 F. Supp. 2d 1167, 1183 (D. Nev. 2009). Indeed, the 638 contract in place between the Tribe and the United States expressly contemplates that ICRA will be the avenue for addressing complaints like Appellant's. It requires the Tribe to "provide administrative due process *pursuant to [ICRA]* to protect the rights and interests that any person[] … may have with respect to [programs] that are provided pursuant to any [funding agreement] negotiated under this Compact." 2-ER-198 (emphasis added). Given these existing checks on tribal supervisors, the balance of policy considerations weighs definitively in favor of tribal absolute immunity.

## CONCLUSION

The Court should affirm.

Dated: February 25, 2026        Respectfully submitted,

                               */s/Leonard R. Powell*
                               Leonard R. Powell

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on February 25, 2026. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

*/s/ Leonard R. Powell*
Leonard R. Powell

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-3136

I am the attorney or self-represented party.

**This brief contains** | 3,758 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated | 2/9/2026 | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Leonard R. Powell | **Date** | 2/25/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**        *Rev. 12/01/22*

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

## No. 21,578

LAURENCE DAVIS, *Appellant,*

v.

NORMAN M. LITTELL, *Appellee.*

**Appeal from the United States District Court for the District of Arizona**

**APPELLANT'S OPENING BRIEF**

LAURENCE DAVIS
140 Duddington Place, S. E.
Washington, D. C. 20003
*In propria persona.*

DUSHOFF, SACKS & CORCORAN
1518 Arizona Title Building
Phoenix, Arizona 85003
*Of Counsel.*

May 26, 1967

FILED

MAY 29 1967

WM. B. LUCK, CLERK

PRESS OF BYRON S. ADAMS PRINTING, INC., WASHINGTON, D. C.



JUN 12 1967



## SUBJECT INDEX

|  |  | Page |
|---|---|---|
| I. | JURISDICTION | 1 |
| II. | STATEMENT OF THE CASE | 2 |
| III. | SPECIFICATION OF ERROR | 3 |
| IV. | ARGUMENT | 3 |
|  | Summary | 3 |

1. The Federal law of executive privilege ..... 4
2. State law governs the plaintiff's claim ..... 5
3. No State law extends executive privilege to a non-Indian contract attorney for an Indian Tribe ..... 5
4. Absolute immunity from tort liability ought not to be extended to tribal attorneys ..... 6
5. Federal policy looks with suspicion upon non-Indian attorneys for Indian tribes ..... 12

V. CONCLUSION ..... 14

## TABLE OF CASES

Adams v. Murphy, 165 Fed. 304 (8th Cir. 1908) ...... 9
Barr v. Matteo, 360 U.S. 564 (1959) ...........4, 6, 7, 11
Bershad v. Wood, 290 F.2d 714 (9th Cir. 1961) ....... 4
Chaflin v. Pratt, 358 F.2d 349 (5th Cir. 1966) ........ 8
Connor v. Timothy, 43 Ariz. 517, 33 P.2d 293 (1934) .. 5
Dombrowski v. Eastland, U.S. Supreme Court, No. 118, October Term 1966 (May 15, 1967) ..............8, 11
Garrison v. Louisiana, 379 U.S. 64 (1964) ..........4, 11
Georgia v. Stanton, 6 Wall. 50 (1867) ................ 7
Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949) ..4, 6, 7, 8, 14
Howard v. Lyons, 360 U.S. 593 (1959) ..........4, 6, 7, 11
Hughes v. Johnson, 305 F.2d 67 (9th Cir. 1962) ...... 8
Kelley v. Dunne, 344 F.2d 129 (1st Cir. 1965) ........ 8
Langford v. Monteith, 102 U.S. 145 (1880) .......... 5
Linn v. United Plant Guard Workers, 383 U.S. 53 (1966) ...................................... 11

ii                    Index Continued

                                                      Page

Littell v. Nakai, 344 F.2d 486 (9th Cir. 1965) .......9, 10
Littell v. Udall, 242 F. Supp. 635 (1965) ............  10
Long v. Mertz, 2 Ariz. App. 215, 407 P.2d 404 (1965).. 5, 6
Martin v. Smith, 1 N.W.2d 163, 140 A.L.R. 1076 (Wis.
    1941) .........................................   9
Matson v. Margiotti, 371 Pa. 188, 88 A.2d 892 (1952)..  6
Mayor v. Cooper, 6 Wall. 247 (1867) ................   4
National Labor Relations Board v. Coca Cola Bottling
    Co., 350 U.S. 264 (1956) ......................  11
New York ex rel. Ray v. Martin, 326 U.S. 496 (1946) ..  5
New York Times Co. v. Sullivan, 376 U.S. 254 (1964)..  11
Norton v. McShane, 332 F.2d 855 (5th Cir. 1964) .....   7
Rosenblatt v. Baer, 383 U.S. 75 (1966) .............  11
S. & S. Logging Co. v. Baker, 366 F.2d 617 (9th Cir.
    1962) .........................................   8
Slocum v. Mayberry, 2 Wheat. 1 ....................   4
Spaulding v. Vilas, 161 U.S. 483 (1896) ............ 4, 7
Tennessee v. Davis, 100 U.S. 257 ..................   4
Tomaris v. State, 71 Ariz. 147, 224 P.2d 209 (1950) ...  9
Udall v. Littell, 338 F.2d 537 (D.C. Cir. 1964) ........  10
Udall v. Littell, 366 F.2d 668 (D.C. Cir. 1966) ........  10
United States v. McBratney, 104 U.S. 621 (1881) .....   5
Wheeldin v. Wheeler, 373 U.S. 647 (1963) ..........4, 11

### OTHER AUTHORITIES CITED

United States Constitution, Article VI, Clause 2 .....   7

STATUTES:

Arizona Revised Statutes (1956)

    Section 38-201 .................................   9
    Section 38-231 .................................   9

Navajo Tribal Code:

    Title 2—

    Sections 821-823 .............................   9
    Section 881 ..................................   9

    Title 7—Section 63 ............................   5

Index Continued                                   iii

United States Code:

    Title 25—                                        Page

        Section 81 ....................................   9
        Section 82 ....................................  13
        Sections 81-84 ...............................  12

    Title 28—

        Section 1291 ..................................   1
        Section 1332 ..................................   1

    Title 42, Section 1985 ...........................   6

OTHER AUTHORITIES:

Annotation, 140 American Law Reports 1076 ........   9
Code of Federal Regulations, Title 25, Parts 71 and 72  12
Corpus Juris Secundum, Vol. 67, "Officers" ........   9
Federal Rules of Civil Procedure, Rule 54(b) .......   3
House Report No. 98, 42d Congress, 3d Sess. (Serial
    1578) "Investigation of Indian Frauds" ....... 12-13



IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

———

No. 21,578

———

LAURENCE DAVIS, *Appellant,*

v.

NORMAN M. LITTELL, *Appellee.*

———

**Appeal from the United States District Court for the District of Arizona**

———

**APPELLANT'S OPENING BRIEF**

———

### I. JURISDICTION

Jurisdiction of the District Court was based on diversity of citizenship under 28 U.S.C. § 1332. At the time of filing the original and the amended complaints, plaintiff was a citizen of Arizona and defendant a citizen of Maryland. The amount in controversy exceeded $10,000. Complaint, par. I (T.R. 1); Amended Complaint, Count I, par. I (T.R. 30); Answer, par. I (T.R. 61). This Court has jurisdiction by virtue of 28 U.S.C. § 1291.

2

## II. STATEMENT OF THE CASE

This is a claim for libel and slander. The defendant, Littell, was general counsel of the Navajo Tribe and plaintiff, Davis, was one of the assistant general counsels. Both are non-Indians. They were employed under a contract approved by the Secretary of the Interior for part-time services, and maintained separate offices off the Navajo Reservation.[1] For reasons of his own Littell wished to have Davis fired.[2] The latter was well thought of by Tribal officials; therefore it was impossible for Littell simply to ask for his dismissal; instead he carried out a slander campaign, accusing Davis of corrupt connections with various interests asserted to be inimical to the Tribe, and in this way destroyed his support among the Tribal officials and secured his dismissal. Even after the dismissal, Littell's slander campaign continued, with an attempt to poison the press against Davis.[3] Davis suffered severe loss of income in consequence, as well as damage to his moral and professional reputation which may not ever be fully ascertained.

This case was decided upon motion for summary judgment. For the first time, in this motion filed some five years after the Complaint, defendant claimed absolute privilege for his slanders, on the ground that he was a

---

[1] See Request for Admissions of Fact and Genuineness of Documents (Second Set), T.R. 140, and defendant's answer thereto, T.R. 156. A copy of the contract, admitted to be genuine, appears at T.R. 143-155.

[2] Since there has been no trial, Littell's motives for wanting Davis dismissed have not been disclosed in this record. Subsequent to his slanders of Davis, Littell's general counsel contract with the Navajos was terminated by the Secretary of the Interior for diverting his clients' assets to his own use and other forms of overreaching. It is now obvious that Littell dared not long tolerate as his associate on the Navajo contract an honest and knowledgeable man. See Udall v. Littell, 366 F. 2d 668 (D.C. Cir. 1966), cert. denied, 385 U.S. 1007 (1967). At the time the slanders of Davis were published, however, Littell's true character was not generally known; hence his lies were still capable of doing damage.

[3] Amended Complaint, T.R. 30-48.

3

public official.[4]  The court below granted the motion.  T.R. 121, 159.

On February 18, 1963, defendant had filed a counter-claim, accusing plaintiff of libel by publishing the original complaint (T.R. 49).  After the District Court granted defendant's motion for summary judgment, plaintiff filed a motion for summary judgment against defendant's counterclaim.  This was denied.  See minute entries, T.R. 181-182.  The current status of the case in the District Court, thus, is that Davis is not only barred from seeking damages for Littell's lies about him, but must defend Littell's $200,000 claim because he dared bring the instant suit and distribute copies of the complaint in an effort to rehabilitate his reputation with some of the persons to whom Littell had published his slanders.

Final Judgment with a Rule 54(b) determination re-quiring this piecemeal appeal was entered over plaintiff's objection on October 13, 1966.  T.R. 167.  Cf. minute entries, October 28, November 10, 1966.  T.R. 181.

## III. SPECIFICATION OF ERROR

The District Court erred in granting defendant's motion for summary judgment, and in entering final judgment for the defendant, on the ground that defendant was entitled to executive privilege.  This was error because the law does not grant immunity from tort liability to contract attorneys for an Indian tribe.

## IV. ARGUMENT

### Summary

The decision of the court below, that the general counsel of an Indian tribe enjoys absolute privilege, is, we believe, wholly unprecedented.  Based on the mechanistic exten-sion of a rule of Federal common law to a field where it

---

[4] An earlier motion to dismiss was denied on May 20, 1963.  See Minute Entries, T.R. 179.

4

is inapplicable, it overlooks the compelling policies of State law, Federal statute, and judicial decisions, which demand exactly the opposite conclusion. By leaving defendant free to seek damages from the plaintiff for daring to sue him, it indeed vests this unworthy former attorney for an Indian tribe with a tyrannous power denied every public official in the United States.[5]

### 1. The Federal law of executive privilege

The doctrine of executive privilege grew out of *Spaulding* v. *Vilas,* 161 U.S. 483 (1896), where the Postmaster General of the United States was held immune from liability for statements contained in a circular to local postmasters. At first confined to libel cases, it was extended to other torts and to subordinate officials by *Gregoire* v. *Biddle,* 177 F. 2d 581 (2d Cir. 1949), cert. denied 339 U.S. 949 (1950).[6] The Supreme Court approved the extension to subordinates in *Barr* v. *Matteo,* 360 U.S. 564 (1959), and *Howard* v. *Lyons,* 360 U.S. 593 (1959). The rule is one of Federal common law, available as a defense to private citizens' claims made under State law against Federal officers.[7]

Defendant Littell does not even claim to be a Federal officer, but the officer of an Indian tribe. Hence merely stating the *Vilas-Gregoire-Barr* rule shows its inapplicability to the case at issue.

---

5 Cf. Garrison v. Louisiana, 379 U.S. 64 (1964).

6 Cf. Bershad v. Wood, 290 F. 2d 714 (9th Cir. 1961), which discusses the law prior to Gregoire.

7    ''When it comes to suits for damages for abuse of power, federal officials are usually governed by local law. See *e.g., Slocum* v. *Mayberry,* 2 Wheat. 1, 10, 12. Federal law, however, supplies the defense, if the conduct complained of was done pursuant to a federally imposed duty (see, *e.g., Mayor* v. *Cooper,* 6 Wall. 247; cf. *Tennessee* v. *Davis,* 100 U.S. 257), or immunity from suit. See *Barr* v. *Matteo, supra; Howard* v. *Lyons, supra.''* Wheeldin v. Wheeler, 373 U.S. 647 (1963).

5

**2. State law governs the plaintiff's claim**

Nine of Littell's slanders about the plaintiff were published in Arizona and one in the District of Columbia. See Amended Complaint, T.R. 30-43. Although both plaintiff and defendant were retained at the time by the Navajo Indian Tribe, they are both non-Indians. Navajo Tribal law does not even purport to govern the relations of non-Indians with each other;[8] and it has long been held that such matters are within State jurisdiction. *Langford* v. *Monteith,* 102 U.S. 145, 147 (1880); *United States* v. *McBratney,* 104 U.S. 621 (1881); *New York ex rel. Ray* v. *Martin,* 326 U.S. 496 (1946).

Arizona and District of Columbia law, therefore, clearly govern the plaintiff's claims here.

**3. No State law extends Executive privilege to a non-Indian contract attorney for an Indian Tribe**

We have discovered no statute or judicial decision of either Arizona or the District of Columbia according absolute privilege to the slanders of an attorney for an Indian tribe. The decision of the District Court in this case is therefore a new departure. In the next section of the brief we shall discuss why it is unwise; here we emphasize that it is unsupported by authority.

The trial judge in his order of September 27, 1966 (T.R. 159), cites only one Arizona case, *Long* v. *Mertz,* 2 Ariz. App. 215, 407 P. 2d 404 (1965). It is a decision of the intermediate appellate court of the State and holds that a public officer of Arizona is absolutely immune from liability for a statement made in the course of his duties. An earlier case in the State Supreme Court, not cited by the trial court here, *Connor* v. *Timothy,* 43 Ariz. 517, 33 P. 2d 293 (1934), held that a slander published by one school board member to another in an official meeting had

---

8 Navajo Tribal Code, Title 7, § 63. (Tribal courts have civil jurisdiction only where the defendant is an Indian.)

6

only qualified privilege. Neither case is a precedent for extending privilege to a non-Indian contract attorney for an Indian tribe. To do so is to make new law, which always ought to be done only on the basis of a careful evaluation of the conflicting values and policies involved. We contend that the District Court falsely weighed the values and policies at stake, if indeed it can really be said to have weighed them at all.

### 4. Absolute immunity from tort liability ought not to be extended to tribal attorneys

Judge Learned Hand justified the rule of absolute immunity for Federal officers by writing:

> ". . . it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties . . . it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Gregoire* v. *Biddle,* 177 F. 2d 579, 581 (1949).

The *Gregoire* case arose in wartime. The plaintiff claimed malicious prosecution and false imprisonment when the Attorney General of the United States and several of his subordinates locked him up on Ellis Island as a German enemy alien, though he was in fact a Frenchman.

Although several State courts have latterly adopted a rule similar to *Barr* and *Howard* to grant State officers absolute immunity from libel claims,[9] they have not followed the full sweep of *Gregoire* and granted all their officials absolute immunity from tort liability for all acts

---

[9] E.g., Long v. Mertz, 2 Ariz. App. 215, 407 P. 2d 404 (1965); Matson v. Margiotti, 371 Pa. 188, 88 A. 2d 892 (1952).

7

within the scope of their authority. In fact, they cannot; for the very same acts which would be absolutely privileged under *Gregoire* if done by a Federal officer, may give rise to statutory liability of State officers under the Civil Rights Act of 1871 (42 U.S.C. § 1985).[10] The Federal rule of absolute immunity presumes a very high degree of trustworthiness in Federal officers, one the law does not accord to State officers, much less to contractors with Indian tribes.

To a large extent, the Federal rule of absolute immunity is judicial legislation to enforce the Supremacy Clause.[11] This is starkly shown in *Norton* v. *McShane*, 332 F. 2d 855 (5th Cir. 1964), cert. denied, 380 U.S. 981 (1965), which was a suit against the Chief U. S. Marshal, the Deputy Attorney General, and others, for false imprisonment at the time of the Oxford, Mississsippi, riots. As applied in *Norton*, the immunity rule amounts to the same thing as the "political question" doctrine of *Georgia* v. *Stanton*, 6 Wall. 50 (1867). It says, in effect, that the courts are not the proper forum for controlling the efforts of the executive to preserve the Nation in time of great public peril.

It is perfectly obvious that the policy underlying *Gregoire, Norton,* and similar cases, has nothing to do with the part-time general counsel of an Indian tribe.

Extending the rule of *Spaulding* v. *Vilas* to the libels of subordinate officers, on the authority of *Gregoire,* was not undertaken without qualms by the Supreme Court. *Barr* and *Howard* were five-to-four decisions, and the five-justice majority could not even agree on a single Opinion of the Court. Two of the majority have since left the bench, and one is about to do so. These are shaky precedents indeed. The Supreme Court has already drawn the line against further extension of absolute immunity. In

---

[10] Cf. Norton v. McShane, 332 F. 2d 855 (5th Cir. 1964).

[11] U.S. Const., Article VI, Clause 2.

8

*Dombrowski* v. *Eastland,* No. 118, October Term 1966, decided *per curiam* as recently as May 15 of this year, it has refused to accord immunity to subordinate officials of the legislative branch. Surely if the counsel of a committee of the United States Senate is not entitled to absolute immunity, neither is the counsel of an Indian tribe.

The Courts of Appeals have not been wholly happy with the enshrinement of *Gregoire.* This court had its qualms in *Hughes* v. *Johnson,* 305 F. 2d 67 (9th Cir. 1962), and *S. & S. Logging Co.* v. *Baker,* 366 F. 2d 617 (9th Cir. 1966). The Fifth Circuit raised the question of whether the immunity doctrine has not gone too far in *Chaflin* v. *Pratt,* 358 F. 2d 349, note 9 at page 353 (1966). The First Circuit has plainly refused to follow *Gregoire* in *Kelley* v. *Dunne,* 344 F. 2d 129 (1965), writing the following wise words (at page 133):

> ". . . since the doctrine of absolute immunity is based upon the relative importance of the public, as against a private, interest, application of the doctrine must vary with the relative weight of the competing interests. In the cases in which private rights have been foreclosed, free exercise of the public function has been considered highly important."

All reason militates against the mechanistic extension of absolute immunity to the non-Indian contract counsel for an Indian tribe, especially in the instant case. There is here no war or national emergency, no question of Federal supremacy, not even any possibility of interference with any interest of the Navajo Tribe, since defendant Littell has already been removed, for misconduct, as its counsel. And the degree of trustworthiness presupposed in the carefully selected Federal officer is wholly lacking in the contract attorney.

Indeed, Littell never was a public official, even of the Navajo Tribe, at any time material hereto. The analogy between the attorney general of a State and a part-time

9

attorney having the duties described in his contract (T.R. 143-155) is too facile.[12]  On this point there is a direct precedent.  *Adams* v. *Murphy,* 165 Fed. 304 (8th Cir. 1908), squarely holds that the general counsel of an Indian tribe is not a public officer.[13]  In regard to Littell himself, the D.C. Circuit has aptly stated:

> "In general, and for present purposes, Appellee's relationship to the Tribe was not unlike that of a private practitioner representing a business enterprise having a variety of recurring legal problems the scope

_____

12 The sections of the Navajo Tribal Code, Title 2, §§ 821-823, dealing with the duties of the general counsel, are merely descriptive, having been adopted subsequently to execution of the contract.  Since the contract and every amendment of it required approval by the Secretary of the Interior (25 U.S.C. § 81), the Tribe was in fact unable to prescribe Littell's duties by law.  Such was Littell's own position in prior litigation before this court.  In Littell v. Nakai, 344 F. 2d 486 (9th Cir. 1965), he sued the Chairman of the Tribal Council, a true public official of the Tribe, for tortious interference with the contract, which he claimed was governed solely by the laws of the United States.  This court recognized that Littell's rights originated in the laws of the United States (at page 488), but held the interpretation of the contract to be within exclusive tribal jurisdiction.

13 The usual tests for "public office" are the following:

Creation by constitutional or statutory provision.  67 C.J.S. 113, Officers, § 5(b) (4).

Incumbent not engaged by contract.  Id. § 6, p. 117.

Position involves a delegation of some part of sovereign power.  Tomaris v. State, 71 Ariz. 147, 224 P. 2d 209 (1950); 67 C.J.S., Officers, § 5(b) (2), p. 110; Martin v. Smith, 1 N.W. 2d 163, 140 A.L.R. 1076 (Wis. 1941).

Incumbent must take oath of office.  67 C.J.S., Officers, § 5(b) (5), p. 114, 140 A.L.R. 1092, cf. Arizona Revised Statutes, § 38-231.

Full time rather than intermittent duties, excluding other employment. 140 A.L.R. 1087.

Citizenship in the sovereignty creating the office.  67 C.J.S., Officers, § 13, p. 127, cf. A.R.S. § 38-201.

Express designation by law of the position as a public office.  See Navajo Tribal Code, Title 2, § 822:

> "An attorney and associate attorneys shall be *employed* to act as General Counsel for the Navajo Tribe."

And compare, § 881:

> "There is created the *office* of the Executive Secretary of the Tribe."

[Emphasis supplied]

10

of which is reasonably well established and sufficiently predictable to relate to a fixed retainer fee." *Udall* v. *Littell*, 366 F. 2d 668, 670 (1966).

It is a non sequitur to state that because the Navajo Tribe is a public body and Littell performed duties for it under contract, therefore he is entitled to absolute immunity for tort liability within the scope of those duties. By such reasoning, the general counsel of a public power district would have absolute immunity; although the general counsel of a privately-owned electric utility, whose actual duties are almost identical, would not. By such reasoning, every contractor building a road for the State Highway Department would be free to run over members of the public with his bulldozers.

It is true that Littell actually did perform work for the Navajo Tribe beyond that prescribed by his contract. Defense counsel, in the motion for summary judgment, referred to him as "the chief non-Indian adviser to the Tribe on matters of policy as well as of law." (T.R. 122). But he achieved this position not by public office, nor by contract, but by usurpation.

This court is well aware of some of the defendant's efforts to retain his usurped power over the Navajos, after they had elected a new chairman on the platform of "Littell must go," and even after the Secretary of the Interior terminated his contract for overreaching.[14] The element of trustworthiness presupposed of Federal, and to a lesser extent of State, officers is wholly lacking.

It is bad law and worse morality to give such a usurper, as the court below does, absolute immunity to the tort claims of his victims, as if he were a public officer. As

---

[14] See Littell v. Nakai, 344 F. 2d 486 (9th Cir. 1965); Udall v. Littell, 338 F. 2d 537 (D.C. Cir. 1964); Littell v. Udall, 242 F. Supp. 635 (1965); Udall v. Littell, 366 F. 2d 668 (D.C. Cir. 1966), cert. denied, 385 U.S. 1007 (1967), rehearing denied, 87 S. Ct. 952.

11

Justice Frankfurter said in *National Labor Relations Board* v. *Coca Cola Bottling Co.,* 350 U.S. 264, 269 (1956):

> "Officers normally means those who hold defined offices. It does not mean the boys in the back room or other agencies of invisible government . . ."

The Federal government and the States have a strong interest, in appropriate cases, to encourage their respective public officers to do their duty without fear of reprisal, but they also have a strong interest in protecting their citizens from malicious onslaughts against reputation and means of livelihood. This appeal ought to be decided by weighing the latter interest against whatever public policy may favor irresponsibility in contract attorneys for Indian tribes, and not by the mechanical extension of a rule of total immunity to an area where the policy and presuppositions that impelled its adoption have no application.

Since the split decision in *Barr* and *Howard,* the Supreme Court itself has reemphasized the "traditional concern of the State to protect its citizens against defamatory attack,"—in a setting where Federal preemption was urged as a defense. *Linn* v. *United Plant Guard Workers,* 383 U.S. 53, 57 (1966).

Save where the defendant is an undoubted public officer of the executive branch, clearly acting within the scope of his public duties,[15] the interest of the wronged citizen ought to receive the greater weight.[16]

---

[15] Cf. Wheeldin v. Wheeler, 373 U.S. 647 (1963), for the current disposition of the Supreme Court to restrict the "perimeter" referred to in Barr and Howard; and see Dombrowski v. Eastland, No. 118, October term 1966 (May 15, 1967).

[16] In anticipation of the answering brief, New York Times Co. v. Sullivan, 376 U.S. 254 (1964), Garrison v. Louisiana, 379 U.S. 64 (1964), and Rosenblatt v. Baer, 383 U.S. 75 (1966), should be distinguished here. These cases deal with libel *of* a public *figure,* not libel *by* a public *officer.* They hold such libels enjoy qualified, not absolute, privilege; and their basis is constitutional law, overriding State common law; not as in Barr and Howard, Federal common

12

### 5. Federal policy looks with suspicion upon non-Indian attorneys for Indian tribes

The policy of protecting the private citizen's reputation and means of livelihood is, of course, one of State law. A Federal policy, however, also urges decision here in favor of the appellant against Littell. This Federal policy is not a general one drawn from the cases on Federal officers, but a specific policy relating to white attorneys for Indian tribes. Congress, from bitter experience, has little sympathy for this class of people.

Many years ago Congress took away from Indian tribes any independent authority which they may have had to engage attorneys, and made the tribe's hiring, the performance of tribal attorneys, and the payment of their fees subject to strict controls by the Secretary of the Interior. Acts of March 3, 1871, and May 21, 1872, R.S. §§ 2103-2106, 25 U.S.C. §§ 81-84. These statutes apply to all attorneys for Indian tribes. 25 C.F.R., parts 71 and 72. (The provisions dealing with tribes not organized under the Indian Reorganization Act are those applicable to the Navajo Tribe. See Request for Admission 9 and 10, T.R. 141, and answer, T.R. 156).

The legislative history of these Acts appears in House Report No. 98, 42nd Congress, 3rd Session (Serial 1578), which is a book of 793 pages, entitled "Investigation of Indian Frauds." The conclusion of the 42nd Congress,

---

law providing a Federal official with a defense to a claim under State common law. The rules are not reciprocal:

"For similar reasons, we reject any suggestion that in our references in *New York Times* . . . and *Garrison* . . . to Barr v. Matteo, 360 U.S. 564, mean that we have tried the *New York Times* rule to the rule of official privilege. The public interests protected by the New York Times rule are interests in discussion, not retaliation, and our reference to *Barr* should be taken to mean no more than that the scope of the privilege is to be determined by reference to the function it serves." Rosenblatt v. Baer, 383 U.S. 75, note 10 on page 84.

The New York Times rule obviously has no bearing on this appeal, except in relation to the counterclaim, which is not now before this court.

13

based upon exhaustive study, was that attorneys for Indian tribes were heartless scoundrels, unprincipled, avaricious, Godless robbers, cunning villains, cormorants, bankrupts in morals, religion and politics, self-serving traducers, disloyal mercenaries, spoilers, etc., etc.  Each and every one of the above epithets is used generally and specifically in the House Report.  For example (at page 76):

> "An Indian-claim agent is unlike most other people. He is generally bankrupt in morals, religion and politics; he will make unconscionable demands for the most imaginary services; he will make any kind of representation to the Indians against the character of his own people and government that, in his judgment, will over-reach his clients; will magnify his own importance and traduce others . . . Will threaten others in order to carry his point . . . [page 77].  In short, if there is anything that an Indian-claim agent will not do, it is that he will not treat his clients, the Indians, honestly."

Congress believed that attorneys for Indian tribes were completely untrustworthy and had to be watched like hawks. The history of Littell's relations to the Navajos (see footnote 14 above) proves that the belief is still justified in some cases.  Tribal counsel were to receive none of the professional confidence accorded to other lawyers.  They were not trusted to negotiate freely with their clients, nor to bill them or receive payment from them without the closest Federal supervision.  Even the normal attorney-client privilege of confidentiality has been abrogated by 25 U.S.C. § 82, which requires sworn service records to be submitted to the Commissioner of Indian Affairs by tribal lawyers "showing each particular act of service . . . giving date and fact in detail."  The Indian lawyer, one of whose principal activities is to prosecute claims against the United States, thus must report to an officer of his adversary everything he has done for his client, office work as well as public appearances in court.

14

With such statutes in force, no tribal attorney can claim the high privilege of a public officer. He cannot even legitimately claim the respect of an ordinary practicing lawyer. The presumption of trustworthiness of the Federal officer, which underlies the *Gregoire* rule, is wholly lacking.

## V. CONCLUSION

An unworthy member of the bar was engaged by contract to perform specified services for an Indian tribe. By a course of overreaching and bullying usurpation he achieved the status of "chief non-Indian adviser . . . in matters of policy as well as of law." The plaintiff, an honest young man, stood in his way; and to remove him he destroyed the young man's reputation and professional standing with his client. The appellant, unlike the unworthy member of the bar, did not sue a tribal official to keep his job; he sued the slanderous tribal attorney for damages.

The court below, in an unprecedented decision, has given the unworthy attorney absolute immunity from his malicious lies, but required the young lawyer to stand trial on a charge of libel for exposing the other attorney.

Such a decision is new law and bad law. Since the question is novel, its decision is a policy choice. Both State and Federal policy require reversal.

While the Secretary of the Interior and the District of Columbia circuit have already removed Littell from the opportunity for further depredations against the Navajos, they have not compensated his victims.

15

One of them here pleads for justice.

Respectfully submitted,

LAURENCE DAVIS
140 Duddington Place, S. E.
Washington, D. C. 20003
Telephone: Home 544-0560
Office 225-6427
(Area Code 202)
*In propria persona.*

DUSHOFF, SACKS & CORCORAN
1518 Arizona Title Building
Phoenix, Arizona 85003
*Of Counsel.*

May 26, 1967

16

### Certificate

I certify that, in connection with the preparation of this brief, I have examined Rules 18, 19 and 39 of the United States Court of Appeals for the Ninth Circuit, and that, in my opinion, the foregoing brief is in full compliance with those rules.

LAURENCE DAVIS
*Attorney*

### Certificate of Service

I hereby certify that I served three copies of the foregoing brief upon counsel for the appellee this date, by mailing the same, postage prepaid, addressed as follows:

William H. Rehnquist, Esq.
Powers & Rehnquist
807 Security Building
Phoenix, Arizona 85004

Dated: May 26, 1967.

LAURENCE DAVIS
*In propria persona*